**UNITED STATES DISTRICT COURT**
**DISTRICT OF MAINE**

| | | |
|---|---|---|
| BONNIE SUE FICKETT, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | 1:10-cv-00497-JAW |
| | ) | |
| GOLDEN EAGLE RESTAURANT, *et al.*, | ) | |
| | ) | |
| Defendants | ) | |

## REPORT OF DAMAGES HEARING AND
## RECOMMENDED DECISION

This matter was referred to me for a damages hearing and a report and recommendation in conjunction with plaintiff's motion for default judgment (Doc. Nos. 9 & 13). Mohamad Abdelrihim and the Golden Eagle Restaurant, a corporation organized under the laws of the State of Maine, with a principal place of business in Madison, Maine (Complaint, ¶ 4) are both named defendants in this action. Both Abdelrihim and the Golden Eagle Restaurant have been defaulted and therefore the hearing was limited to the issue of damages. Abdelrihim appeared in response to a subpoena served upon him by plaintiff's counsel. Both he and his wife, Rhonda Abdelrihim, offered evidence on the issue of the amount of plaintiff's damages. Bonnie Fickett also testified regarding the amount of her damages. She claims damages, including liquidated damages, in the amount of $64,765.60, plus costs and attorney fees. Abdelrihim offered no good cause for his default within the meaning of Rule 55(c) and, accordingly, I recommend that default judgment be entered for the plaintiff in the amount of $7088.49 in damages, plus $7088.49 in liquidated damages on counts I-IV of the complaint, plus costs and attorney fees, plus prejudgment interest under Maine law, based upon the following proposed findings of fact and conclusions of law.

## PROPOSED FINDINGS OF FACT

The defendants received notice of this lawsuit and understood that they had until January 3, 2011, to respond. Abdelrihim realized shortly after the first of the year that he had not made a timely response to the lawsuit and decided to do nothing. He admitted he never contacted anyone or sought to have the default set aside. He took no action until he received a subpoena regarding the damages hearing. He and his wife appeared for the hearing. Abdelrihim and Fickett have been involved in administrative proceedings through the state regarding unemployment compensation and an investigation into payroll practices at this business. Abdelrihim clearly knew that Fickett had a dispute with him about her wages and hours.

Bonnie Sue Fickett began working as a waitress at the newly opened Golden Eagle Restaurant on December 22, 2008. Abdelrihim was the owner of the restaurant and Fickett's employer for all practical purposes. Rhonda Abdelrihim, his wife, has full-time employment as a medical assistant and historically had little to do with the operation of the restaurant. Her role included working in the restaurant on Sundays, occasionally cleaning linens for the banquet hall, and, during the last three weeks of Fickett's employment, scheduling the employees' work hours. Fickett worked at the restaurant until the later part of July 2010, when she was either terminated or left the defendants' employ because of a constructive discharge due to Abdelrihim's failure to schedule her for sufficient hours of employment. Abdelrihim maintains that he never terminated Fickett and that she voluntarily quit reporting for work. He attributes any scheduling concerns she might have had to the economic times and the fact that the restaurant business was slow. That dispute was apparently resolved in the unemployment compensation arena where Fickett ultimately prevailed and received unemployment compensation. In any event, the reason for leaving Abdelrihim's employ does not have to be resolved in order to make a damages

determination on the wage and hour portion of this claim. Additionally, Fickett failed to present a case for emotional pain and suffering at her damages hearing, so even though Fickett includes a count in her complaint based on the anti-retaliation provisions of the FLSA, 29 U.S.C. § 215 (Compl., Count V), there is no reason to make additional findings concerning the reasons why Fickett's employment ended at the Golden Eagle Restaurant. Otherwise, Fickett does not seek reinstatement or "back pay."

*Take Home Pay*

During the first three weeks of her employment as a waitress, the parties agree that Fickett was paid an hourly wage, plus tips. Fickett says she made roughly $600 weekly during this initial period. The parties dispute the hourly wage. Fickett claims it was $5.00 per hour and Abdelrihim claims he paid the minimum wage for waitresses, which he pegs at $3.00 and change, plus tips. Abdelrihim paid Fickett's wages in cash, giving Fickett money from the register when he paid Fickett.

The evidence establishes that the prevailing minimum wage for all workers in Maine was $7.25 per hour from December 22, 2008, until October 1, 2009, when it climbed to $7.50 per hour.

The evidence also establishes that effective January 12, 2009, Fickett assumed additional duties as a manager pursuant to the same payment arrangement. At this point in time, a minimum wage, forty-hour-per-week position would have paid $ 290.00 weekly. Overtime hours would add an extra $10.88 per hour worked. However, in her new position as manager/waitress Fickett did not earn as much in tips as she previously had during her initial weeks of employment because she had less "floor time" and more managerial duties.

According to her demonstrative exhibit, Fickett took home roughly $200.00 less per week

3

after she assumed the managerial duties. According to her demonstrative aid and her testimony, she was thus taking home approximately $400.00 per week during the period from January 12 to April 19, 2009. (See Plaintiff's Ex. 2).

Throughout the foregoing period, the number of hours Fickett worked and the amount of money she took home weekly—both in wages and in tips—fluctuated. Neither Abdelrihim nor Fickett was happy with the fluctuating hours and the varying weekly wage. When Fickett returned from a March 2009 vacation she resumed working long hours and Abdelrihim fell five weeks behind in her pay. Abdelrihim paid Fickett for two of these weeks by the usual method, but paid her a flat $ 300.00 for the other three.

Finally, in April 2009, Fickett and Abdelrihim negotiated a straight salary of $ 300.00 per week, plus Fickett could keep her own tips. Although the testimony is unclear, it is apparent to me that the $300.00 in cash from the register was supplemented to some extent by tips. Thus, from April 19, 2009, through to the week ending June 19, 2010, Fickett received at least the $300.00 per week salary, in cash from the register, plus whatever tips she collected, unless she was on vacation. While Fickett testified that Abdelrihim did not pay her for each week she worked and that he would sometimes get behind in his payments, neither her demonstrative chart nor any of the pleadings she has filed claims as damages the failure to receive her negotiated salary each week. Fickett's claims are that she worked well in excess of the forty-hour work week and that she was never compensated for her *overtime*.

According to Fickett, she continued to receive her weekly salary in cash from the register throughout most of 2009.[1] I credit this testimony, though it cannot be reconciled with her tax

---

[1] Fickett says she was put on the payroll for one week in July 2009, because Abdelrihim was applying for a municipal grant and grant eligibility related to the size of a business's payroll. While interesting, this event sheds little light on the salary received by Fickett or the number of overtime hours she worked. However, it does appear that Abdelrihim made use of a payroll service and kept records of hours worked for some of his employees. Other

4

return for 2009. There, Fickett reported receiving only $6,000.00 in wages, salaries or tips from the Golden Eagle Restaurant for calendar year 2009. That would amount to only 20 weeks of a $300.00 salary, without any allowance for tips or overtime. It appears that Fickett under-reported her income.

Fickett did not receive any pay for the weeks when she took vacations, which included at least four weeks in 2009.

*Estimated Hours*

According to Fickett, throughout this time and into June 2010, she was working between eighty and one hundred hours per week and receiving only her $300.00 weekly salary on a sporadic basis, plus tips.

There are no time records to support Fickett's testimony regarding her overtime hours. The only extant records are found in Defendants' Exhibit 4, weekly work schedules for 13 random weeks between June 2009 and July 2010, and Defendants' Exhibit 3, a solitary time card for the week of June 21, 2010. According to undisputed testimony, these time schedules introduced by Defendants were retrieved from restaurant trash by Fickett and provided to the Maine Department of Labor in June 2010, when she became a "whistleblower" and complained about Abdelrihim's payroll practices. Apparently the Department of Labor, as part of its investigation, returned these schedules to Abdelrihim. I find that these schedules do indicate the general hourly schedules for the weeks in question. None of the exhibits suggests that Fickett was working between 80 and 100 hours per week. The 13 weeks reflected in the schedules show work hours varying from 29 to 56 per week. They are probative of little, other than that Fickett frequently was scheduled to work in excess of forty hours. To that extent they corroborate her

---

than the exhibits mentioned in these findings of fact, there were no records of Bonnie Fickett's employment presented at the hearing, although it is undisputed that she worked as a waitress/manager of the restaurant.

testimony.

As for Fickett's estimation that she worked 80 or more hours every week, I find that testimony to be incredible. Instead, I find that her average overtime, more likely than not, was 20 hours per week. This finding matches Fickett's own affidavit submitted in support of the motion for attachment (Doc. No. 4-1, ¶ 5) and passes the straight face test in terms of actual hours worked under the $300.00 per week salary that Fickett negotiated with Abdelrihim. I do not believe that Fickett would have agreed to a $300.00 salary if there was an expectation that she work 80 or more hours.

In support of my finding of an average of 20 overtime hours per week, I accept Fickett's testimony that she worked in excess of the "floor" hours scheduled for her waitress work. I just do not accept the number she has estimated. Abdelrihim's dismal failure to keep any records and to include Fickett on his payroll system puts him in the unenviable position of having absolutely no evidence to refute her allegations. I find from the testimony presented that both Abdelrihim and Fickett were attempting to game the system by undertaking an "under the table," cash only method of payment. It is more likely than not that Fickett worked in excess of forty hours many weeks and never received anything in excess of the $300.00 cash salary and whatever tips she was able to pocket.

### *Out of Pocket Expenses*

Fickett also maintains that she was purchasing restaurant supplies and paying restaurant bills out of her own pocket, without ever receiving reimbursement for those items. Plaintiff's Exhibit 3 is a compendium of claimed out-of-pocket expenses. However, there is no claim for these expenditures in the complaint, unless they could be categorized as general compensatory damages under the FLSA claim. In any event, I find Fickett's presentation on these expenses,

6

which include electricity payments, rubbish removal expenses, and company car insurance premiums, unreliable and incredible. I credit Abdelrihim's testimony that he reimbursed Fickett for any incidental out-of-pocket expenditures she made for the restaurant.

### *Emotional Harm*

I recognize and credit Fickett's testimony that this was a stressful ordeal for her to undergo and that it was upsetting for her. However, her degree of emotional upset did not strike me as sufficient to support a compensatory award.

### *Proposed Damages Computation*

Based upon my review of the testimony, with the aid of the demonstrative chart provided by Fickett, I offer the following computation of Fickett's lost-wages. The computation is broken into four periods of time.

1. Period One (Dec. 22, 2008—Jan. 12, 2009)

First, for the period from December 22, 2008, to January 12, 2009, I find that Fickett was fully compensated by the wages and tips she received for the total hours she worked under both her minimum wage and overtime hours counts. Fickett testified that business was very good during this time and that she worked on the "floor" earning tips to supplement the cash wages paid to her by Abdelrihim.

2. Period Two (Jan. 12, 2009—Apr. 18, 2009)

During the second period, from January 12, 2009, to April 18, 2009, I find that Fickett did not obtain adequate compensation for the hours worked beyond forty per week. During this period her weekly cash salary varied, but her average take home pay, including tips, was $400 per week. This amount is not adequate to pay the minimum wage for 60 hours of work, let alone the overtime premium. Consequently, Fickett received less than was due.

7

Fickett claims she should have received $725.20 per week for 80-hours of work. As indicated above, I find that she worked an average of 60 hours, not 80. Based on this figure, Fickett should have received at least $290.00 for 40 hours at $7.25 per hour, plus $217.60 for 20 overtime hours at $10.88, for a total of $507.60 per week. During this 14-week period, Fickett took two weeks of unpaid vacation and, therefore, was only entitled to compensation for twelve weeks. Based upon these figures, Fickett should have been paid $507.60 per week during this period and based upon her representations, which Abdelrihim has no records to disprove, she was only taking home $ 400.00 per week. That means that damages for this period equal $1,291.20 ($107.60 weekly shortfall x 12 weeks).

  3. Period Three (Apr. 19, 2009—October 3, 2009)

A significant alteration in the employer/employee relationship occurred after April 19, 2009, because Fickett became a salaried employee with additional managerial duties. Rather than receiving a variable weekly wage, the parties agreed that she would receive $300 weekly, plus whatever tips she collected waiting tables. I find that she likely continued to make $400 per week, on average, in total take home pay, once her tips are factored in. Fickett testified that her tips went down when she assumed the additional managerial duties, but I am not persuaded by this testimony. Fickett would not have been inclined to agree to the new arrangement if it would prove likely that she would receive less take home pay.

For the next twenty weeks the minimum wage remained at $7.25 per hour, with overtime chargeable at $10.88 per hour. Fickett received on average $ 400.00 per week in total pay, albeit on a sporadic basis. Taking a 60-hour week and using the same minimum hourly rates, there is, again, a $107.60 per week shortfall. Although the period runs 20 weeks, there are records

8

demonstrating that Fickett did not work 60 hours in at least six weeks.[2] Those six weeks break down as follows:

>Week of June 22, 2009: 12 overtime hours, calling for $420.56 in pay.

>Week of June 29, 2009: 16 overtime hours, calling for $464.08 in pay.

>Week of July 13, 2009: 9 overtime hours, calling for $387.92 in pay.

>Week of July 27, 2009: 2 overtime hours, calling for $311.76 in pay.

>Week of August 31, 2009: 8 overtime hours, calling for $377.04 in pay.

>Week of September 7, 2009: 0 overtime hours, calling for $290 in pay.

In light of Fickett's tip income, more likely than not she received adequate pay in all of these weeks except the first two. Using the presumption of $400 total weekly income, including tips, I find a shortfall of $84.64.

I therefore conclude that Fickett is entitled to the $107.60 per week shortfall for fourteen weeks, amounting to $1506.40 ($107.60 x 14 weeks), plus $84.64 for two of the other six weeks, for a total of $1591.04.

>4. Period Four (Oct. 4, 2009—June 19, 2010)

The final period is the period from October 4, 2009, to June 20, 2010, encompassing the final weeks that Fickett worked as a manager/waitress before her termination. This period is like the preceding period for computational purposes except that the minimum wage in this period climbed to $7.50 per hour, with an overtime rate of $11.25 per hour.

I use June 20, 2010, as the end date for this final period because, in the last three weeks of her employment, Fickett returned to waitress duties only, worked fewer than 60 hours, and failed to demonstrate a minimum wage or overtime violation for the work weeks of June 20,

---

[2] The work schedules retrieved from the trash tell the tale. I have used these numbers to compute the overtime for these weeks.

June 27, and July 4, 2010, based in large measure on the reduced number of hours reflected in the defendants' exhibits. Defendants' time card (Ex. 3) and time schedules (Ex. 4) tend to support this finding.

In the 37 weeks between October 4, 2009, through the week ending June 19, 2010,[3] Fickett should have received $525.00 per week rather than $400, but only for those weeks in which she worked 60-hours. However, the available documentation reveals that during four of those weeks, Fickett worked less than sixty hours.[4] The total in unpaid wages for the 33 weeks is $4125 ($125 per week x 33 weeks), using the same estimates as before, but new hourly rates. The unpaid wages for the other four weeks break down as follows:

> Week of March 22, 2010: 4 overtime hours, calling for $345 in pay.
>
> Week of April 5, 2010: 5 overtime hours, calling for $356.25 in pay.
>
> Week of April 12, 2010: 16 overtime hours, calling for $480 in pay.
>
> Week of June 14, 2010: 9 overtime hours, calling for $401.25 in pay.

I find that Fickett has failed to demonstrate unpaid wages during the week of March 22 and the week of April 5, 2010. Despite her reduced "floor" hours, she more likely than not earned sufficient money in tips to satisfy minimum wage and overtime requirements. The other two weeks, however, have an unmet payment obligation of $81.25. This means that the total in unmet wages for this final period is $4206.25.

   5.  Total

When the four periods are added together, the total in unpaid wages comes to $7088.49.

---

[3] As reflected in the defendants' time schedules, the defendants considered Monday to be the first day of the week and Sunday to be the last.

[4] See footnote 2, above.

**PROPOSED CONCLUSIONS OF LAW**

In the State of Maine, from December 2008 to October 1, 2009, the hourly minimum wage was $7.25 per hour; from October 1, 2009, through the present, the minimum hourly wage has been $7.50 per hour. 26 M.R.S. § 664(1). A service employee, such as a waitress, may receive a tip credit from the employer, reducing the hourly minimum wage by 50%, to $3.63 and $3.75, respectively. However, an employer who elects to use this tip credit to reduce the amount paid as wages must be able to show that the employee receives at least the minimum hourly wage for the number of hours worked when the direct wages and the tips are combined. Id. § 664(2). Abdelrihim has made no such showing.

Any hours that Fickett worked in excess of 40 hours in any one week must be compensated at 1.5 times the regular hourly rate. Id. § 664(3). Fickett has a right to bring a private action for unpaid wages pursuant to 26 M.R.S. § 670, and pursuant to that same statutory provision, in addition to a recovery for unpaid wages, the court "shall include" in its judgment an amount equal to the unpaid wages as liquidated damages, as well as costs and a reasonable attorney's fee.

Fickett is entitled to the identical recovery under 29 U.S.C. § 216(b).

Fickett can only recover her economic damages and her liquidated damages once. The state and federal liquidated damages remedies are identical in nature and do not stack for a double recovery. Rodriguez v. Almighty Cleaning, CV 09-2997 (JS) (AKT), 2011 U.S. Dist. Lexis 19111, *26 n.5, 2011 WL 691184, *9 n.5 (E.D. N.Y. Feb. 28, 2011) (Mag. J. R&R); Genao v. Blessed Sacrament Sch., 07 CV 3979 (CLP), 2009 U.S. Dist. Lexis 95787, *32, 2009 WL 3171951, *9 (E.D. N.Y. Oct. 1, 2009) (Mag. J. Order). Fickett does not argue otherwise.

Courts have recognized that compensatory damages for emotional distress can be appropriate in cases where retaliatory discharge has been proven under 29 U.S.C. § 215(a)(3). See Travis v. Gary Community Mental Health Ctr., Inc., 921 F.2d 108, 111-112 (7th Cir. 1990). Assuming, because this is a default hearing, that defendants' retaliatory intent has been proven, an award of compensatory or punitive damages is not appropriate relief in this case because Fickett has not proven any emotional distress damages. See Sines v. Serv. Corp. Int'l, 03 Civ. 5465 (SC), 2006 WL 3247663, 2006 U.S. Dist. LEXIS 82164 (S.D. N.Y. Nov. 8, 2006) (incorporating into judgment jury verdict finding retaliation under FLSA but making no damages award for pain and suffering).

Fickett has also brought a count complaining about Abdelrihim's failure to keep adequate records of her hours worked. He clearly had an obligation to do so pursuant to 29 U.S.C. § 211(c), but Fickett does not have an additional claim for damages arising from Abdelrihim's failure to do so. Rather, she obtains the benefit of an evidentiary burden shift which allows this Court to award damages to her despite the approximate nature of her proof, because she has shown that she performed work for which she was regularly under-compensated and her evidence suffices to permit a finding of "the amount and extent of [her] work as a matter of just and reasonable inference." Anderson v. Mt. Clemens Pottery Co., 328 U.S. 680, 687 (1946). See, e.g., Perez v. Palermo Seafood, Inc., 548 F. Supp. 2d 1340, 1346 (S.D. Fla. 2008) (applying evidentiary rules of Anderson where employee was paid in cash and employer failed to keep records). In this case, Fickett has made just such a showing and Abdelrihim has not produced accurate or reliable records to rebut her claim, except to the limited extent noted in my findings of fact.

Fickett's complaint includes a prayer for prejudgment interest. Prejudgment interest is not available under federal law because Fickett is receiving a liquidated damages award. Lupien v. City of Marlborough, 387 F.3d 83, 90 (1st Cir. 2004) (citing Brooklyn Sav. Bank v. O'Neil, 324 U.S. 697, 715 (1945)). However, Fickett is entitled to prejudgment interest under Maine law on her entire damages award, including the liquidated damages portion. Avery v. Kennebec Millwork, Inc., 2004 ME 147, ¶¶ 7-8, 861 A.2d 634, 636 (applying 14 M.R.S. § 1602-B(3)). Because Fickett has not made any presentation revealing that she served Defendants with a notice of claim, prejudgment interest accrues from the filing of the complaint through the entry of judgment. Id. § 1602-B(5).

## CONCLUSION

Based on the factual findings and conclusions of law set forth above, I recommend that default judgment enter in the amount of $14,176.98, representing $7088.49 in unpaid wages plus another $7088.49 in liquidated damages, on Counts I-IV, and that no compensatory damages be awarded on Count V. No damages are available for the claim asserted in Count VI. Plaintiff shall support her request for costs and attorney's fees in accordance with Local Rules.

## NOTICE

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which *de novo* review by the district court is sought, together with a supporting memorandum, within fourteen (14) days of being served with a copy thereof. A responsive memorandum shall be filed within fourteen (14) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to *de novo* review by the district court and to appeal the district court's order.

/s/ Margaret J. Kravchuk
U.S. Magistrate Judge

March 30, 2011